## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **STATE OF MAINE,** *et al.*     )<br>                                  )<br>     **Plaintiffs,**               )<br>                                  )<br>          **v.**                  )<br>                                  )     **1:14-cv-00264-JDL**<br>**GINA MCCARTHY,** in her capacity )<br>as Administrator, United States   )<br>Environmental Protection Agency,  )<br>*et al.*                          )<br>                                  )<br>     **Defendants.**              ) | |

### ORDER ON MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD, OR ALTERNATIVELY, FOR CONSIDERATION OF EXTRA-RECORD EVIDENCE

On February 2, 2015, the U.S. Environmental Protection Agency ("EPA") formally disapproved certain surface water quality standards that the plaintiffs State of Maine and the Maine Department of Environmental Protection ("Maine DEP") (collectively, "Maine") had promulgated under the Clean Water Act, 33 U.S.C.A. §§ 1251-1388 (2016).  ECF No. 30-1.  Maine seeks judicial review of EPA's disapproval (the "February 2015 Disapproval") pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C.A. §§ 701-706 (2016), and the citizen suit provisions of the Clean Water Act, 33 U.S.C.A. § 1365(a)(2) (2016).  ECF No. 30.  Maine also seeks declaratory relief.  *Id.*

In March 2016, the EPA filed an administrative record (ECF No. 38) consisting of 174 documents.  ECF No. 48 at 1.  Maine now seeks to supplement the record with

twenty-six additional documents (the "Documents").[1]  ECF No. 46 at 1.  Alternatively, Maine argues that I should consider the Documents as extra-record evidence or take judicial notice of them.  *Id.* at 1, 10.

## I. LEGAL STANDARD

When a challenge to an agency's decision is presented, the agency must compile and designate the administrative record that it directly or indirectly considered in reaching its decision on the action being challenged.  *Cty. of San Miguel v. Kempthorne,* 587 F. Supp. 2d 64, 72 (D.D.C. 2008) (quotation omitted).  "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts,* 411 U.S. 138, 142 (1973); *see also Boston Redev. Auth. v. Nat'l Park Serv.*, --- F.3d ----, 2016 WL 5335493, at *4 (1st Cir. Sept. 23, 2016).

An agency's designation of the administrative record is entitled to a presumption of administrative regularity.  *Friends of the Boundary Mountains v. U.S. Army Corps of Eng'rs*, 2013 WL 4589466, at *1 (D. Me. Aug. 28, 2013) (citation omitted).  This presumption of regularity may be rebutted only upon clear evidence that "the agency's designated record is not accurate and complete[.]"  *Kempthorne,* 587 F. Supp.2d at 72 (quoting *The Fund for Animals v. Williams,* 391 F. Supp. 191, 194 (D.D.C. 2005) (internal quotation marks omitted); *see also Amfac Resorts, LLC v. U.S. Dept. of the Interior,* 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (describing the

---

[1] Maine initially submitted twenty-seven documents for supplementation or extra-record consideration.  ECF No. 46 at 1.  However, the parties agree that Exhibit 6 is already contained in the Administrative Record at AR 3748, ECF No. 48 at 5 n.4; ECF NO. 50 at 1, n.1, and that Maine's motion is moot as to this exhibit.

evidentiary standard as a "significant showing[,]" "strong[,]" "substantial[,]" and "prima facie").

Other courts faced with allegations of an incomplete record have started their inquiry by determining what encompasses the "whole record." *See Kempthorne,* 587 F. Supp. 2d at 71 (quoting *Amfac Resorts,* 143 F. Supp. 2d at 12). The whole administrative record "should include all materials that might have influenced the agency's decision, and not merely those on which the agency relied in its final decision." *Amfac Resorts,* 143 F. Supp. 2d at 12 (quoting *Bethlehem Steel v. EPA,* 638 F.2d 994, 1000 (7th Cir. 1980) (internal quotation marks omitted)). This may include the work and recommendations of an agency decision maker's subordinates, *id.* at 12-13, but not "deliberative intra-agency memoranda and other such records" that are ordinarily privileged, *id.* at 13 (citing *In re Subpoena Duces Tecum Served on Office of Comptroller of Currency,* 156 F.3d 1279, 1280 (D.C. Cir. 1998) (other citations omitted).

"In the event the administrative record is found inadequate for judicial review, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Olsen v. United States,* 414 F.3d 144, 155 (1st Cir. 2005) (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985) (internal quotation marks omitted)). "Ideally, the agency—not the district court—should be the body to augment the record." *Maine Med. Ctr. v. Burwell,* --- F.3d ----, 2016 WL 6310800, at *3 n.4 (1st Cir. Oct. 27, 2016). In the "rare circumstances" where remand to the agency is not appropriate, the administrative record may be supplemented if there is a "strong showing of bad faith or improper behavior" by

agency decision makers.  *Olsen,* 414 F.3d at 155 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420 (1971).  The administrative record may also be supplemented where there is a "failure to explain administrative action as to frustrate effective judicial review."  *Camp,* 411 U.S. at 142-43; *see also Olsen,* 414 F.3d at 155-56.

Maine contends that the circumstances surrounding the EPA's February 2015 Disapproval were "unusual," ECF No. 46 at 4, and that the EPA's accompanying rationale (R. 5303-5353) "raises questions about EPA's underlying motives and warrants the consideration of all of the Documents[,]" ECF No. 50 at 1.  I interpret this argument—questioning the EPA's motives—as an allegation of improper behavior by agency decision makers.

Maine also cites alleged "unreconciled inconsistencies" between the February 2015 Disapproval and the Clean Water Act, the 1980 Acts, and the EPA's "historical approach to Maine's [water quality standards] in Indian Waters[,]" *id.*, and claims that these inconsistencies amount to a failure to adequately explain administrative action in a way that frustrates effective judicial review, ECF No. 46 at 4.[2]  The 1980 Acts consist of the Maine Indian Claims Settlement Act, 25 U.S.C §§ 1721-1735 ("MICSA") (2015) and the Maine Implementing Act, 30 M.R.S.A. §§ 6201-6214 ("MIA").

---

[2] Maine also contends, without any citation to legal authority, that because each of the Documents constitutes "important background[,]" they are properly considered "for at least that reason alone." ECF No. 46 at 5.  Even assuming that the Documents do provide important background information for the EPA's February 2015 Action, they cannot supplement the administrative record or be considered as extra-record evidence on this basis alone without some accompanying legal support.

Maine also asserts that certain exhibits (Exhibits 1, 2, 4, 7, and 12-18) are adverse to the EPA's position, and therefore should supplement the record or otherwise be considered for that reason alone.  ECF No. 46 at 5.

An agency "may not skew the [administrative record] in its favor by excluding pertinent but unfavorable information[,]" and may not exclude information on the grounds that it did not rely on that information for its final decision. *Fund for Animals,* 391 F. Supp. 2d at 197 (citing *Envtl. Def. Fund v. Blum,* 458 F.Supp. 650, 661 (D.D.C. 1978)).  Where a party makes a *prima facie* showing that the agency either intentionally or negligently excluded from the record evidence adverse to its position, then supplementation of the record may be proper.  *San Luis Obispo Mothers for Peace v. NRC,* 751 F.2d 1287, 1327 (D.C. Cir. 1984), *vacated in another part,* 760 F.2d 1320 (D.C. Cir. 1985) (en banc), *and aff'd,* 789 F.2d 26 (D.C. Cir. 1986) (en banc).  Documents qualify as "adverse" where they "potentially disprove" the agency's position, with the burden on the plaintiff to make a "substantial," or *prima facie* showing.  *Kempthorne,* 587 F. Supp. 2d at 76-77.

## II. LEGAL ANALYSIS

## A.   Stipulation Regarding the EPA's Position

It is necessary to pinpoint EPA's position in this case in order to judge whether a particular exhibit is adverse to that position.  The parties have stipulated that the EPA asserts that:[3] (1) prior to the February 2015 Disapproval, there had never been any water quality standards in effect for any Clean Water Act purpose for any Maine

---

[3] The parties agreed to a total of eighteen joint stipulations, only six of which I discuss in this Order as pertinent to the analysis of Maine's motion.  *See* ECF No. 44.

Indian Waters, ECF No. 44 at 2, ¶ 1; (2) Maine's water quality standards were not applicable and did not need to be attained in any Maine Indian Waters for any purpose under the Clean Water Act, *id.* at 2-3, ¶ 2; (3) the only water quality standards that have ever been in effect or needed to be attained in Maine Indian Waters for Clean Water Act purposes are those set forth and approved for the first time in EPA's February 2015 Disapproval, *id.* at 3, ¶ 5; (4) the February 2015 Disapproval represents the first time that the EPA stated its interpretation that Maine's longstanding designated use of fishing, set forth in Maine's Water Classification Program, 28 M.R.S.A. §§ 464-470 (2016), also encompasses a designated use of sustenance fishing for Clean Water Act purposes for any Indian tribes in Maine in any Maine Indian Waters, *id.* at 4, ¶ 7; (5) the EPA's actions before 2005, in which it applied Maine's water quality standards directly to Indian Waters, were mistakes, *id.* at 5, ¶ 14; and (6) before the February 2015 Disapproval, the EPA had never addressed whether members of Indian tribes in Maine are the intended target population of an EPA-approved state designated use of sustenance fishing, and whether unsuppressed tribal fish consumption rates must be used when establishing water quality standards in Maine Indian Waters, *id.* at 6, ¶ 15.

In determining whether a given document is adverse to or potentially disproves the EPA's position, I refer to these stipulations in my analysis.[4]

---

[4] Maine argues that some of the Documents are properly considered because they are evidence of inconsistencies between the EPA's February 2015 Disapproval and its regulations, guidance, and practice. ECF No. 46 at 5. However, the authority that Maine cites to support this proposition does not establish that an insufficiently explained departure from EPA precedent is grounds for supplementing the administrative record or considering extra-record evidence. *See P.R. Sun Oil Co. v. EPA,* 8 F.3d 73, 77 (1st Cir. 1993) (EPA action was insufficiently explained and therefore found to be arbitrary and capricious).

**B.    The Exhibits**

With the three bases for supplementing the administrative record in mind—improper agency behavior, failure to adequately explain administrative action, and exclusion of documents adverse to the agency's position—I now turn to a consideration of the Documents.

**Exhibit 1:**   Exhibit 1 (ECF No. 46-2) is a March 1982 "Status Report on Maine Indians" written by the EPA.  Maine argues that the report emphasizes that Maine law on environmental protection applies in Indian territory and is inconsistent with the February 2015 Disapproval.  ECF No. 46 at 5-6.  The EPA notes that its February 2015 Disapproval says substantially the same thing as Exhibit 1, i.e., Maine has the authority to adopt water quality standards that are applicable to waters in Indian lands.  ECF No. 48 at 6 (citing ECF No. 30-1 at 1).

I am not persuaded that Exhibit 1 is adverse to or inconsistent with the EPA's position.  *See* ECF No. 44.   Therefore, Maine's Motion to Supplement the Administrative Record is denied with respect to Exhibit 1.

**Exhibits 2 and 3:** Exhibit 2 is a 1993 EPA analysis of the Penobscot Indian Nation's ("Penobscots'") application for "Treatment as a State" status under § 518(e) of the Clean Water Act, which was undertaken by the tribe in an effort to receive funds under § 106 of the Clean Water Act.  ECF No. 46-3.  Exhibit 3 is a letter from

---

To the extent that Maine alleges that a specific document is evidence of an unexplained departure from EPA precedent, I treat it as an allegation that the document is adverse to the EPA's position or that the EPA failed to adequately explain its administrative action.

the EPA to the Penobscots summarizing the same issues raised in Exhibit 2.   ECF
No. 46-4.

Maine argues that, in Exhibit 2, the EPA "concludes that the history and text
of [the Maine Implementing Act, 30 M.R.S.A. §§ 6201-6214] reflect an intention to
limit the jurisdictional authority of Maine's tribes[,]" and that this represents an
inadequately explained inconsistency with the February 2015 Disapproval.   ECF No.
46 at 6.   The EPA argues that Exhibit 2 is irrelevant to its February 2015 Disapproval
because the document is focused upon the Penobscots' "Treatment as a State" status.
ECF No. 48 at 8.

Although Exhibit 2 does discuss the 1980 Acts and the limitations they
imposed upon the sovereignty of Maine Indian tribes, *see* ECF No. 46-3 at 8-14, the
EPA did not cite Indian tribe sovereignty or jurisdiction as a basis for its disapproval
of certain of Maine's water quality standards, *see* ECF No. 30-1 at 47-48, nor is it
mentioned in the parties' joint stipulation regarding the EPA's position in this
litigation, *see* ECF No. 44.   Accordingly, I am not persuaded that this document is
adverse to or inconsistent with the EPA's position.   Furthermore, Maine has not
alleged that Exhibit 2 constitutes evidence of improper agency behavior.   *See* ECF
No. 46 at 5-6.   Thus, Maine's Motion to Supplement the Administrative Record is
denied with respect to Exhibit 2.   Maine's motion is also denied with respect to Exhibit
3 because that document is substantively similar to Exhibit 2.

**Exhibit 4:**   Exhibit 4 is a 1995 memorandum from James Sappier, then the
EPA's Regional Indian Program Director for Region 1, to nine New England Indian
tribe representatives, in which Sappier refers to a "proposed concept paper" that

8

contemplated allowing Indian tribes to promulgate their own water quality standards without any underlying tribal authority under the Clean Water Act.  ECF No. 46-5.

Maine argues that this memorandum is evidence of improper EPA behavior because it reflects the "EPA's pursuit of a tribal water quality regulatory agenda without the requisite [Clean Water Act] tribal authority and in violation of the 1980 Acts and the [Clean Water Act]."  ECF No. 46 at 5 n.4.  The EPA counters that Exhibit 4 reflects consideration of "base [water quality standards] for Indian country nation-wide[,]" because States other than Maine lack authority to establish water quality standards for Indian country, and that communicating this fact to the Maine Tribes does not show bad faith or an improper purpose.  ECF No. 48 at 6.

The enthusiastic language contained in Exhibit 4 ("It looks like EPA has finally woken up!") and the reference to Indian tribes as the appropriate "governing body," ("Where standards do not exist, EPA must work with the governing body—in this case the Tribes—of the certification area") permits a rebuttable inference that the EPA sought to recognize Maine tribal jurisdiction over water quality standards despite the tribes' reduced sovereignty under the 1980 Acts.  ECF No. 46-5 at 1; *see also* Maine Indian Claims Settlement Act, 25 U.S.C.A. §§ 1721-1735 (2016); Maine Implementing Act, 30 M.R.S.A. §§ 6201-6214.  Although the proposed concept under consideration was a nationwide concept, the fact that the memorandum was addressed to representatives of Indian tribes throughout New England, including representatives from the Passamaquoddy tribe, Penobscot Indian Nation, the Houlton Band of Maliseet Indians, and the Aroostook Band of Micmac Indians, supports this inference.

9

While the inference of improper EPA behavior that may be drawn from Exhibit 7 is by no means conclusive, it is sufficient, on its face, to grant Maine's Motion to Supplement the Administrative Record with respect to Exhibit 4.

**Exhibit 5:**   Exhibit 5 is a 2000 memorandum from the EPA's New England Region Office of Regional Counsel to the U.S. Department of the Interior concerning National Pollution Discharge Elimination System permit-holders discharging waste in and around Maine Indian country.   ECF No. 46-6. Attached to the memorandum are two lists of entities that the EPA and Maine tribes knew or believed to be discharging waste into or near Indian Waters in Maine.   *Id.*

Maine argues that the memorandum presumes that Maine's water quality standards were in effect in Indian Waters and that such a presumption by the EPA is inconsistent with the February 2015 Disapproval and has not adequately been explained.   ECF No. 46 at 7.   Maine also asserts that Exhibit 5 reflects the EPA's "prior coordination of water quality efforts with Maine's tribes," ECF No. 50 at 7 n.9, as well as the EPA's prior efforts to rely on the "internal tribal matters" exception contained in the Maine Implementing Act, 30 M.R.S.A. § 6206(1), as a basis of authority for tribes to regulate their own water quality, ECF No. 46 at 7.   According to Maine, such coordination reflects improper behavior and justifies supplementing the administrative record with Exhibit 5.   ECF No. 50 at 7 & n.9.

The EPA counters that Exhibit 5 is not evidence of any inconsistency because the EPA stated as part of the February 2015 Disapproval that "in some instances EPA appears to have previously assumed that state [water quality standards] applied in certain Indian waters."   ECF No. 48 at 7 (citing AR-5317).   The EPA also argues

that the memorandum merely notes the "internal tribal matters" exception contained in the Maine Implementing Act and does not state an opinion about it.  *Id.*

 The degree of coordination between the EPA and the Maine tribes evidenced in Exhibit 5 does not constitute a "strong showing" of improper agency behavior.  At most, it establishes that the Maine tribes submitted to the EPA a list of dischargers in and around Indian waters that were of concern to them.  *See* ECF No. 46-6.  Maine offers no explanation for how this is improper, even given the tribes' reduced sovereignty under the 1980 Acts.  *See* ECF No. 46; ECF No. 50.

Additionally, the issue of the "internal tribal matters" exception is raised in the memorandum only to contemplate what might result if the Department of the Interior concluded that the exception applied.  ECF No. 46-6 at 1-2.  Nowhere in Exhibit 5 is the EPA's opinion on this issue expressed.

Therefore, Maine's Motion to Supplement the Administrative Record is denied with regard to Exhibit 5.

**Exhibit 7:**  Exhibit 7 is an EPA-published summary of Maine's water quality standards.  ECF No. 46-8.  It defines multiple classifications of water, including fresh surface waters, lakes and ponds, estuarine and marine waters, and groundwater.  ECF No. 46-8 at 7.  It also lists permissible ranges of ph values, dissolved oxygen, temperature change, nutrients, toxic metals, pesticides, organics, and bacteria for such waters.  *Id.* at 8-10.

Maine characterizes Exhibit 7 as an EPA "guidance" and argues that it is inconsistent with the February 2015 Disapproval because it contains no qualification regarding Maine's water quality standards in Indian Waters.  ECF No. 46 at 7; ECF

No. 50 at 6.  Maine claims that "[n]othing in Exhibit 7 suggests that" the EPA had not already approved Maine's water quality standards with regard to Indian Waters; that Maine's designated use of "fishing" as used throughout its water classification system also encompassed an additional designated use of tribal sustenance fishing in Indian Waters; or that any part of the Maine Implementing Act constituted a designated use of tribal sustenance fishing for the Southern Tribes in their reservations.  ECF No. 46 at 7.  Maine also claims that Exhibit 7 is adverse to the EPA's position.  *Id.* at 5.

I am not persuaded that Exhibit 7 is necessarily inconsistent with the February 2015 Disapproval or otherwise adverse to the EPA's position based on the absence of any qualification regarding Maine's water quality standards in Indian waters.  *See id.* at 7 ("Nothing in Ex. 7 suggests that . . . .").  That Maine has identified a document that is devoid of support for the EPA does not satisfy its burden to identify *prima facie* evidence of adversity or a failure to adequately explain the February 2015 Disapproval.  Stated differently, the absence of consistent statements or data does not equal a positive finding of an *in*consistent statement or data.

Likewise, I am not persuaded by Maine's contention that Exhibit 7 is "required for completeness in light of the voluminous other EPA guidance" that was included in the administrative record.  ECF No. 46 at 7.  Despite Maine's characterization of Exhibit 7 as an EPA "guidance," the document itself states that it is a summary.  ECF No. 46-8 at 1.  Also, Maine cites no legal authority which suggests that "completeness" is an issue that a court must consider when contemplating a motion to supplement the administrative record.  *See* ECF No. 46; ECF No. 50.

Thus, Maine's Motion to Supplement the Administrative Record is denied with respect to Exhibit 7.

**Exhibits 8 through 11:** Exhibit 8 is a 2004 EPA-published fact sheet concerning the national listing of state-issued fish consumption advisories.  ECF No. 46-9.  Exhibit 9 is a 2000 EPA Guidance for Assessing Chemical Contaminant Data for Use in Fish Advisories.  ECF No. 46-10.  Maine alleges that Exhibit 9 "reflects recommended EPA [fish consumption rates] and cancer risk levels for use in fish advisories that are inconsistent with the February 2015 [Disapproval.]"  ECF No. 46 at 8 (citing R. 1613-1620).  Exhibit 10 is a 1994 Joint Health Advisory issued by the Maine Department of Human Services announcing that high levels of mercury were found in some fish sampled from Maine lakes and ponds, and citing the major sources of mercury as "industrial regions south and west of Maine, in addition to limited local sources[.]"  ECF No. 46-11 at 1.  Exhibit 11 is a 1997 press release issued by the Maine Department of Human Services announcing an extension of fish consumption advisories from Maine lakes and ponds to inland rivers and streams due to elevated levels of mercury found in state fish samples.  ECF No. 46-12 at 1.

Maine argues that these four exhibits should be added to the administrative record or otherwise considered as "explanatory background" in order to serve as evidence that the February 2015 Disapproval "will have limited practical effect on actual tribal fish consumption in Maine[.]"  ECF No. 46 at 8.  Maine also claims that Exhibits 8 through 11 show that the February 2015 Disapproval "is less about the ability of Maine Indians to consume more fish, but is more an attempt to sidestep and re-interpret Maine's unique jurisdictional arrangements[.]"  *Id.*

13

The EPA distinguishes between fish consumption advisories, which it characterizes as health-based recommendations, and water quality standards, which it claims are legally binding rules, and asserts that it did not consider Exhibits 8 through 11 in the February 2015 Action.  ECF No. 48 at 7-8.

I interpret Maine's argument that the February 2015 Disapproval is "an attempt to sidestep and re-interpret Maine's unique jurisdictional arrangements" to be an argument that the exhibits are *prima facie* evidence of improper behavior by the EPA.  Yet these documents say nothing, on their face, regarding the EPA's alleged improper motive in taking action on state water quality standards.  Instead, the documents require an inference to be drawn that the fish consumption advisories mean that sustenance fishing is not possible.  This falls short of the "strong" and "substantial" showing that is Maine's burden as the party seeking to supplement the administrative record.  *See Amfac Resorts,* 143 F. Supp. 2d at 12.

Thus, Maine's Motion to Supplement the Administrative Record is denied with respect to Exhibits 8 through 11

**Exhibits 12-16:**   Exhibits 12 through 16 are correspondence between the Maine DEP, the U.S. Department of Health and Human Services' Indian Health Service ("IHS"), the Passamaquoddy Indian Township's tribal government, and the EPA.

Exhibit 12 is a July 1987 letter from the Maine DEP to the Indian Township Tribal Government regarding the Passamaquoddy tribe's request for comment from the state concerning a sewage treatment plant in Indian Township.  ECF No. 46-13. Exhibit 13 is an August 1987 letter from the IHS to the Maine DEP, advocating for a

14

new sewage treatment plant at Indian Township. ECF No. 46-14. Exhibit 14 is a June 1988 letter from the IHS to the EPA, requesting consideration of a proposed Indian Township community wastewater project as an EPA construction grants project. ECF No. 46-15. Exhibit 15 is a June 1988 EPA memorandum recommending that the Indian Township wastewater project be considered for funding. Exhibit 46-16. The memorandum discusses Maine state law as "prohibit[ing] new direct discharges into Class GP-A waters" and acknowledges that the tribe holds a Maine Waste Discharge License. *Id.* at 1. Exhibit 16 is a 1989 letter from Attorney Gregory Sample of the Portland law firm of Tureen & Margolin to the Maine DEP regarding the DEP's denial of a license modification for the Indian Township sewage treatment plant. ECF No. 46-17.

Maine asserts that Exhibits 12 through 16 demonstrate that the EPA accepted Maine's water quality standards as being in full force and effect in Indian Waters, which is inconsistent with the February 2015 Disapproval and has not been adequately explained. ECF No. 46 at 8. This assertion is plainly unfounded with regard to Exhibits 12, 13, and 16, none of which were written by, addressed to, or copied to the EPA. *See* ECF No. 46-13; ECF No. 46-14; and ECF No. 46-17. It is also unfounded with regard to Exhibit 14, which was not written by the EPA and therefore cannot be said to demonstrate the EPA's position on Maine's water quality standards one way or the other. ECF No. 46-15. Maine's motion is therefore denied with regard to these four exhibits.

Exhibit 15, on the other hand, does reflect an implicit recognition by the EPA of Maine state water quality laws and the ability of the Maine DEP to issue waste

15

discharge licenses, although the memorandum does not specifically reference any state water quality standards.  *See* ECF No. 46-16.  The EPA argues that there is no inconsistency because it stated in the February 2015 Disapproval that "in some instances EPA appears to have previously assumed that state [water quality standards] applied in certain Indian waters."  ECF No. 48 at 7, 8.  The parties have jointly stipulated that the EPA's position in this litigation is that instances in which it applied Maine's water quality standards directly to Indian Waters were mistakes. ECF No. 44 at 5, ¶ 14.  Maine disputes the EPA's position.  The EPA also argues that it has included other examples of specific National Pollution Discharge Elimination System permits in the administrative record to allow for judicial review of this issue, and that Maine has not shown that judicial review would be frustrated without Exhibit 15.  ECF No. 48 at 8.

Although Maine has not shown that Exhibit 15 reflects improper agency behavior or a failure to explain that would frustrate judicial review, I do conclude that Exhibit 15 is adverse to the EPA's stipulated position that there had never been any water quality standards in effect as to any Maine Indian Waters for purposes of the Clean Water Act, ECF No. 44 at 2, ¶ 1; *see also Fund for Animals,* 391 F. Supp. 2d at 197.  In addition, the exhibit appears to recognize Maine's jurisdiction to legislate and regulate water quality in Maine Indian waters.  *See* ECF No. 46-16.

Although the EPA admits that it may have previously assumed that Maine water quality standards applied in Indian waters, ECF No. 48 at 7, it asserts that its pre-2005 actions to apply such state water quality standards in Indian waters were mistakes.  ECF No. 44 at 5, ¶ 14.  This contention does not diminish my conclusion

16

that Exhibit 15 is facially adverse to the EPA's position in this litigation given that the EPA also maintains, as noted above, that no water quality standards were ever in effect in Maine Indian waters for purposes of the Clean Water Act, and that Maine's water quality standards were not applicable and did not need to be attained under the Clean Water Act.  *Id.* at 2-3, ¶¶ 1, 2.

Therefore, Maine's Motion to Supplement the Administrative Record is granted with regard to Exhibit 15 (ECF No. 46-16).

**<u>Exhibit 17</u>:** Exhibit 17 is a 1999 Environmental Agreement between the Penobscots and the EPA.  ECF No. 47.  The Agreement states that its purpose is "to better achieve mutual environmental-governmental goals in the government-to-government relationship between the Nation and the U.S. EPA," and also states that "[t]he U.S. EPA is implementing its federal trust responsibility with federally recognized Indian Tribes through this Agreement."  ECF No. 47 at 2.

Maine contends that Exhibit 17 is one of several documents that reflect improper EPA behavior regarding "the tribal aspects of the EPA Action[,]" because, although the EPA admits that no Maine tribe has obtained Treatment as a State status for water quality purposes, it nevertheless consulted with Maine tribes regarding water quality standards without involving Maine, despite the fact that Maine has statewide authority over water quality standards.  ECF No. 46 at 8-9; ECF No. 50 at 6-7.

The EPA argues that Treatment as a State status was not a consideration in the February 2015 Disapproval, and that therefore, Maine has not met its burden of showing improper agency behavior.  ECF No. 48 at 9.  However, this argument does

not rebut the fact that Exhibit 17, on its face, provides support for the claim that the EPA treated the Penobscots as it would any other federally-recognized Indian tribe, despite the reduced sovereignty conferred upon Maine Tribes under the 1980 Acts. *See* ECF No. 47 at 2; *see also* 25 U.S.C. §§ 1721-1735; 30 M.R.S.A. §§ 6201-6214. While the EPA may successfully counter this contention, Exhibit 17 can be construed as evidence of possible improper behavior by the EPA.  Maine's Motion to Supplement the Administrative Record is granted with regard to Exhibit 17.

**Exhibit 18:**  Exhibit 18 is a May 2007 letter from counsel for the Penobscots to the U.S. Court of Appeals for the First Circuit stating the tribe's position in *Maine v. Johnson,* 498 F.3d 37 (1st Cir. 2007), regarding Maine's National Pollution Discharge Elimination System permit authority in Indian waters.[5]  ECF No. 47-1.  The letter also summarizes certain arguments that the EPA made before the First Circuit.  *See id.* at 1.

Maine makes the same arguments for supplementing the record with Exhibit 18 as it did for Exhibit 17, i.e., that the letter "complete[s] the record of EPA's tribal outreach," that it reflects the EPA's process in a *de facto* promulgation of federal water quality standards, and that it is evidence of improper EPA behavior regarding "the tribal aspects of the EPA Action[.]"  ECF No. 46 at 9; ECF No. 50 at 6-7.

Because the EPA did not write the letter, it cannot be said to reflect the agency's views.  If Maine seeks to use the EPA's arguments in *Maine v. Johnson* against the agency, then the more appropriate vehicle is the EPA's own letter to the

---

[5] Although the subject line of the letter in Exhibit 18 refers to *Penobscot Nation and Passamaquoddy Tribe v. EPA,* No. 04-1375, that case was consolidated with *Maine v. Johnson,* No. 14-1363, 498 F.3d 37.

First Circuit, which is referenced in Exhibit 18, and which presumably is reflected on the docket of that case. ECF No. 47-1 (summarizing a May 11, 2007 letter from the EPA to the First Circuit regarding Maine's National Pollution Discharge Elimination System authority). Accordingly, Maine's Motion to Supplement the Administrative Record is denied with regard to Exhibit 18.

**Exhibits 19 through 21:** Exhibits 19 through 21 are communications between the EPA and the Penobscots regarding the tribe's pending application for Treatment as a State status in order to implement its own National Pollution Discharge Elimination System permit program under § 518 of the Clean Water Act. ECF No. 47-2; ECF No. 47-3; ECF No. 47-4.

Maine argues that Exhibits 19 through 21 "complete the record of EPA's tribal outreach," reflect the EPA's process in a *de facto* promulgation of federal water quality standards, and are evidence of improper EPA behavior because, although the EPA admits that no Maine tribe has obtained Treatment as a State status for water quality purposes, it nevertheless consulted with Maine tribes regarding water quality standards without involving Maine, despite the fact that Maine has statewide water quality standards authority. ECF No. 46 at 9; ECF No. 50 at 6.

This argument falls short of a strong showing of improper behavior for two reasons. First, Exhibits 19 through 21 do not concern any effort to implement tribal water quality standards. ECF No. 47-2; ECF No. 47-3; ECF No. 47-4. Instead, the correspondence between the EPA and the Penobscots concerns a proposed tribal National Pollution Discharge Elimination System permitting program and the tribe's related efforts to obtain Treatment as a State status. ECF No. 47-2; ECF No. 47-3;

ECF No. 47-4.  Second, even if the sought-after tribal National Pollution Discharge Elimination System permitting program and Treatment as a State status are assumed to be closely related or equivalent to the adoption of tribal water quality standards, Exhibits 19 through 21 do not indicate whether either effort was ever approved.  *See* ECF No. 47-2; ECF No. 47-3; ECF No. 47-4.  Instead, the letters from the EPA to the Penobscots merely reflect that the tribe's application is under review. ECF No. 47-3; ECF No. 47-4.

Therefore, I conclude that Exhibits 19 through 21 do not constitute a strong showing of improper EPA behavior, or a failure to explain administrative action that frustrates effective judicial review.   Maine's Motion to Supplement the Administrative Record is denied with regard to Exhibits 19 through 21.

**Exhibit 22:**   Exhibit 22 is a 2014 letter from EPA headquarters to all federally recognized tribes regarding the EPA's then-proposed reinterpretation of the Clean Water Act's Treatment as a State provision.  ECF No. 47-5.

As with Exhibits 19 through 21, Maine argues that Exhibit 22 "complete[s] the record of EPA's tribal outreach," reflects the EPA's process in a *de facto* promulgation of federal water quality standards, and is evidence of improper EPA behavior regarding "the tribal aspects" of the February 2015 Disapproval.  ECF No. 46 at 9. The EPA argues that Exhibit 22 is irrelevant to the February 2015 Disapproval because Treatment as a State status was not a factor in the EPA's decision to disapprove certain of Maine's water quality standards.  ECF No. 48 at 9.

The EPA letter refers to "a delegation by Congress of authority to *eligible* tribes to administer Clean Water Act regulatory programs[.]"  ECF No. 47-5 at 1 (emphasis

added).  The EPA's qualification that the contemplated delegation of Clean Water Act authority was for "eligible" tribes only rebuts Maine's argument that Exhibit 22 is evidence that the EPA improperly sought to eliminate the need for tribes to demonstrate their authority to regulate under the Clean Water Act.  *See* ECF No. 46 at 9.

For this reason, Maine's Motion to Supplement the Administrative Record is denied with regard to Exhibit 22.

**Exhibits 23-27:**     Exhibit 23 is a March 2015 letter from the EPA to the State of Washington's Department of Ecology offering the EPA's comments to Washington's proposed human health criteria of the state's water quality standards. ECF No. 47-6.

Exhibit 24 is a May 2015 letter from the National Association of Clean Water Agencies to the EPA expressing concerns regarding what it described as the EPA Region 10 office's actions "to influence the outcome of the Washington Department of Ecology's proposed human health criteria and implementation provisions."  ECF No. 47-7.

Exhibit 25 is a May 2015 letter from the EPA Region 10 office to the Idaho Department of Environmental Quality commenting on Idaho's proposed revisions to state human health ambient water quality criteria.  ECF No. 47-8.

Exhibit 26 is a December 2015 letter from counsel for the Northwest Pulp and Paper Association submitting additional comments to the EPA's proposed revision to federal water quality criteria applicable to Washington State.  ECF No. 47-9.

Exhibit 27 is Maine's notice of intent to sue the EPA, dated March 17, 2015. ECF No. 47-10.

Maine argues that Exhibits 23 through 27 are evidence of improper EPA behavior because they provide background information and context to the EPA's motivations.  ECF No. 50 at 7; ECF No. 46 at 9-10.  This argument, which is not accompanied by any citation to legal authority, is unpersuasive because Exhibits 23-27 post-date the February 2015 Disapproval, and therefore, they could not have been before the agency when the Disapproval was under consideration.  *See Volpe,* 401 U.S. at 420 ("[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision.") *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99 (1977).  Accordingly, Maine's Motion to Supplement the Administrative Record is denied with regard to Exhibits 23 through 27.

## C.  References in Maine's First Amended Complaint

Maine argues that Exhibits 2, 17, and 19-22 should have been included in the administrative record because they were referenced and quoted in its First Amended Complaint dated September 25, 2014, and therefore were "before" the EPA prior to the February 2015 Disapproval.  ECF No. 46 at 5 n.4 (citing *Kempthorne,* 587 F. Supp. 2d at 71-72, 76-77).

Maine's citation of *Kempthorne* does not support its position that documents referenced or quoted in a complaint are before the agency that is being sued.  Instead, the cited portions of *Kempthorne* state that: (1) a party seeking to supplement the record must establish not only that the information was known to the agency but also that the information "directly relates to the decision," and is adverse to the agency's position, 587 F. Supp. 2d at 71-72, and (2) that documents produced by an agency as

22

part of a Freedom of Information Act request "represent all public documents that were considered in the decision-making process[,]" *id.* at 76-77.

Given this lack of legal authority to support Maine's position, I conclude that the documents that were referenced or quoted in Maine's First Amended Complaint should not supplement the administrative record on that basis, alone.

## D.   Consideration of Extra-Record Evidence

As an alternative to supplementing the administrative record, Maine argues that the Documents should be considered as extra-record evidence.  ECF No. 46 at 2, 4-5.  A court may consider extra-record materials "(1) when necessary to determine whether the agency considered all relevant factors in making its decision; (2) when the agency has relied on extra-record materials; (3) when necessary to explain technical terms or complex subject matter; or (4) when the agency has acted in bad faith." *Ruskai v. Pistole,* 775 F.3d 61, 66 (1st Cir. 2014) (quoting *WildWest Inst. v. Bull,* 547 F.3d 1162, 1176 (9th Cir. 2008) (internal quotation marks omitted)).

The twenty-six Documents that Maine seeks to have considered outside of the record do not fall within these four categories.  Maine makes no mention of relevant factors that went unconsidered in the February 2015 Disapproval, nor does it identify any extra-record documents that the EPA purportedly considered.  *See* ECF No. 46. None of the Documents are alleged by Maine to explain technical terms or complex subject matter.  *See id.*  Finally, although Maine's allegations of improper behavior by the EPA could conceivably fall under the category of "bad faith," Maine does not argue this point.  *See id.*

Maine's motion is therefore denied with respect to consideration of extra-record materials.

## E.   Judicial Notice of Certain Documents

Maine contends that I should take judicial notice of and consider Exhibits 1, 2, 3, 5, 7, 8, 9, 20 through 23, and 25 on the basis that there can be no reasonable dispute that the EPA issued these documents and that they reflect "the EPA guidance, actions, agreements, and/or communications set forth in those documents."[6]   ECF No. 46 at 10.

The doctrine of judicial notice permits a court to consider a generally accepted or readily verified fact as proved without requiring evidence to establish it.   Fed. R. Evid. 201.   "A judicially noticed fact must be one not subject to reasonable dispute; such a fact must be capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."   *Maine v. Norton,* 257 F. Supp. 2d 357, 373 (D. Me. 2003) (citing Fed. R. Evid. 201(b)).

I take judicial notice of the fact that the cited documents were created by the EPA, as the EPA letterhead on each document suggests, and the fact that each document accurately reflects the content it purports to communicate.   There is no dispute on these narrow points.   *See* ECF No. 48 at 10.   *See also* ECF No. 46-2; ECF No. 46-3; ECF No. 46-4; ECF No. 46-6; ECF No. 46-8; ECF No. 46-9; ECF No. 46-10; ECF No. 47-3; ECF No. 47-4; ECF No. 47-5; ECF No. 47-6; ECF No. 47-8.   However, my analysis of the Documents, above, leads me to conclude that they are of limited

---

[6]   Because I granted Maine's Motion to Supplement with regard to Exhibits 4, 15, and 17, above, I have omitted these exhibits from the discussion on judicial notice.   I have also omitted Exhibit 6 from this discussion, per footnote 1, above.

probative value and I therefore decline to consider them in the judicial review of the February 2015 Disapproval.

### III. CONCLUSION

For the reasons explained above, Maine's Motion to Supplement the Administrative Record, or Alternatively, for Consideration of Extra-Record Evidence (ECF No. 46) is **GRANTED IN PART** with regard to Exhibit 4 (ECF No. 46-5), Exhibit 15 (ECF No. 46-16), and Exhibit 17 (ECF No. 47).  Maine's motion is **DENIED** in all other respects.

**SO ORDERED.**

**Dated this 18th day of November 2016.**

_____**/s/ JON D. LEVY**_____
**U.S. DISTRICT JUDGE**

25