# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| STATE OF MAINE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ANDREW WHEELER, Acting Administrator, U.S. Environmental Protection Agency, *et al*. <br><br> Defendants and <br><br> HOULTON BAND OF MALISEET INDIANS and PENOBSCOT NATION, <br><br> Defendant-Intervenors. | Civil Action No. 1:14-cv-264 JDL |

# DEFENDANT-INTERVENORS HOULTON BAND OF MALISEET INDIANS' AND PENOBSCOT NATION'S MOTION TO STAY ORDER OF REMAND AND INCORPORATED MEMORANDUM OF LAW

# INTRODUCTION

The Houlton Band of Maliseet Indians and the Penobscot Nation ("Tribes") respectfully move the Court to stay its Order on EPA's Motion for Voluntary Remand, ECF 162, pending the outcome of related administrative proceedings. The State of Maine and Tribes have negotiated an agreed-upon framework under *state* law to protect the designated use of sustenance fishing that sidesteps the dispute underlying this litigation – whether (and if so, how) *federal* law requires Maine to protect tribal sustenance fishing under the Clean Water Act (CWA). The Maine Department of Environmental Protection (DEP) is currently promulgating human health criteria (HHC) to protect this new designated use, and the U.S. Environmental Protection Agency (EPA) is optimistic that it will approve DEP's revised water quality standards (WQS). This decision will replace and supersede EPA's 2015 decision, mooting the dispute underlying this case and enabling its resolution. EPA nevertheless proposes in the interim to take action on remand – the reversal of the substance of the 2015 decision – that is unnecessary and would thwart the bargain struck by the State and Tribes, create regulatory uncertainty, and threaten new litigation. The Tribes accordingly ask the Court to stay its order remanding the decision to EPA.

## FACTS AND PROCEDURAL HISTORY

I.  <u>The Underlying Dispute Over EPA's 2015 Framework for Sustenance Fishing</u>

"In February 2015, the EPA issued a formal decision in which it approved some of Maine's water quality standards and disapproved others, including those standards affecting tribal lands which, it concluded, did not adequately protect tribal fishing rights." ECF 162 at 2. EPA's decision set forth a framework to protect tribal sustenance fishing with reference to the Maine Indian Claims Settlement Act and Maine Implementing Act ("Settlement Acts"). ECF 30-1 at 8, 23-33. Plaintiffs the State of Maine and the DEP Commissioner (presently Gerald Reid)

2

challenged the 2015 framework in October 2015. ECF 30.

When Maine did not revise its WQS to resolve EPA's concerns, EPA promulgated federal replacement WQS. 81 Fed. Reg. 92,466 ("Maine Rule"). The State did not challenge the Maine Rule, which remains in force today. "In February 2017, in the wake of the 2016 presidential election and subsequent change of administrations, Maine petitioned the EPA to reconsider its decision, . . . which led to the granting of a stay of this case from May to December, 2017." ECF 162 at 3. After nine months of review, EPA denied the petitions, reporting on December 8, 2017: "After careful consideration, EPA has determined not to withdraw or otherwise change any of the decisions that are challenged in this case." ECF 109 at 2. Maine filed its merits brief on February 16, 2018, disputing EPA's 2015 framework, including *inter alia* EPA's finding of a sustenance fishing designated use in tribal waters and its requirement of a higher fish consumption rate (FCR) to protect that use. ECF 118.

II.     EPA's Motion for Voluntary Remand and the Parties Effort to Resolve This Dispute

On July 27, 2018, EPA moved for a voluntary remand of its 2015 decision to reconsider the gravamen of the State's challenge: EPA's decision (1) interpreting Maine's fishing designated use to mean sustenance fishing on tribal waters, (2) to approve provisions in the Settlement Acts as a sustenance fishing designated use, and (3) to disapprove Maine's human health criteria in its WQS as not sufficiently protective of the sustenance fishing designated use. *Id.* at 2. The Penobscot Nation concurrently moved to amend its answer to assert a counterclaim regarding "whether [it] has a statutory right to engage in sustenance fishing which carries with it a right to water quality that ensures that there will be fish of sufficient quality and quantity to safely sustain the tribe. . . . That right would require Maine to promulgate water quality standards protecting sustenance fishing within reservation waters." ECF 162 at 7. The Court

granted EPA's motion for a voluntary remand without vacatur, and stayed this case until December 3, 2019. *Id.* at 8. The Court retained jurisdiction over the remand and also granted Penobscot's motion, describing the counterclaim as the "inverse" of the State's claim. *Id.* at 7-8.

In early 2019, the State and Tribes undertook to forge a new path. As EPA informed the Court in April 2019, "EPA, the State of Maine, and the Tribal-intervenors are currently engaged in discussions to explore the possibility of the State of Maine taking a new approach to addressing sustenance fishing through a combination of legislative and regulatory action." ECF 178 at 1. The goal was to negotiate a sustenance fishing designated use and HHC to protect that use and to replace EPA's disputed *federal* law framework with this alternative *state* law framework. The result was An Act to Protect Sustenance Fishing, L.D. 1775, which establishes the designated use, sets an FCR of 200 grams/day and cancer risk level ($1 \times 10^{-6}$), and identifies specific waters subject to the use, including tribal waters. *Declaration of Cory J. Albright* at 5-26. DEP and the Tribes identified these waters of critical significance to tribal fishers, *id.* at 35-42 (maps of tribal sustenance fishing waters), through discussions with tribal natural resources departments and interviews with tribal fishers. *E.g.*, https://tinyurl.com/yy7wx4ur at 2:56:19-2:57:38 (testimony of Maliseet Chief Clarissa Sabattis). The Maine Legislature passed L.D. 1775 on June 10, and Governor Janet Mills signed the bill into law on June 21, 2019. ECF 179 at 3.

The parties uniformly testified in support of L.D. 1775, explaining their intent to resolve the pending litigation and to avoid future disputes over WQS to protect tribal sustenance fishing. For example, Plaintiff and DEP Commissioner Gerald Reid explained:

> Several years ago, a dispute arose among the State of Maine, the U.S. EPA, the Penobscot Nation and the Houlton Band of Maliseet Indians related to sustenance fishing and the regulation of water quality. The parties disagreed on the rights and authority that each held under provisions of the Maine Indian Land Claims Settlement Acts and the Clean Water Act. Eventually the EPA disapproved certain water quality standards and adopted a federal regulation containing new

4

> water quality standards that it determined were necessary to protect tribal sustenance fishing in waters within and adjacent to Indian Territory in Maine. The State challenged EPA's disapprovals in court on jurisdictional and procedural grounds, and the Penobscot Nation and Houlton Band of Maliseet Indians intervened. That lawsuit is still pending but is currently stayed.
>
> In February of this year, the four parties to that litigation, together with the Passamaquoddy Tribe and the Aroostook Band of Micmacs, began discussing how to break the impasse. The idea was to come to an agreement on what water quality standards were appropriate and where they should apply, but not require any of the parties to give up their positions on the legal and jurisdictional positions that had formed the basis of the dispute. In other words, we wanted to find a way to put aside the legal arguments and move ahead to accomplish something important. This bill is the product of those negotiations.
>
> . . . If this bill is enacted in its current form, I expect that it will be approved by EPA and allow for settlement of the lawsuit still pending in federal court.

*Albright Decl.* at 28-29, 31. Sara Gideon, Speaker of the House and sponsor of L.D. 1775, and Attorney General Aaron Frey offered similar testimony regarding the intent to move beyond this litigation and the long-standing disputes regarding the Settlement Acts. *Id.* at 44-45, 47-48.

Tribal leaders expressed the same understanding. For example, Penobscot Nation Chief Kirk Francis testified that while "Maine and its DEP have been litigating against the EPA and the Penobscot Nation," L.D. 1775 represents DEP's and the current administration's "willingness to set aside arguments about whether Maine must take these steps [to protect sustenance fishing]," and "sets aside these areas of inherent sovereignty about which the Nation and Maine are not yet in full agreement." *Id.* at 50-51. *See also* https://tinyurl.com/yy7wx4ur at 2:53:48-2:54:32 (Chief Sabattis testimony). EPA actively supported the passage of L.D. 1775, sending two separate letters in support of the bill. *Albright Decl.* at 64-66, 68-69.  EPA stated that it is "optimistic" that Maine's alternative framework to protect sustenance fishing and revised WQS will be approved. *Id.* at 68. EPA also advocated for the "Bill Summary" negotiated by the parties, which reflects their desire to avoid confronting the disputed legal issues in this case. *Id.* at 25-26, 68.

5

III. DEP's Pending Rulemaking and EPA's Proposed Action on Remand

The State and Tribes are continuing to work together so that L.D. 1775 accomplishes its goals. DEP must adopt rules "no later than March 1, 2020 that calculate and establish water quality criteria protective of human health for toxic pollutants and the sustenance fishing designated use." *Id.* at 13. On October 2, 2019, DEP initiated the rulemaking process. *Id.* at 71-98. DEP's public comment period runs through December 6, and a public hearing is scheduled for November 21, 2019. *See* https://www.maine.gov/dep/rules/index.html#1587974. The Tribes and State are collaborating so that DEP's record enables EPA to replace the disputed 2015 framework with the agreed-upon framework without reigniting the dispute in this case.

In the event EPA approves Maine's forthcoming revised WQS, *all parties* to this litigation will be in agreement as to the WQS applicable in Maine waters, including tribal waters. This will render unnecessary the resolution of the State's claims and Penobscot's counterclaim regarding whether and how *federal* law requires Maine to protect tribal sustenance fishing in the absence of action under *state* law. If EPA approves Maine's revised WQS, it can withdraw the Maine Rule through ministerial action. 81 Fed. Reg. 92,466, 92,469 (Dec. 19, 2016) ("EPA's federally promulgated WQS are and will be applicable for purposes of the CWA until EPA withdraws those federally promulgated WQS. EPA would undertake a rulemaking to withdraw the federal WQS if and when Maine adopts and EPA approves corresponding WQS . . . .").

But EPA now threatens to throw a wrench in the works and thwart the parties' intent that L.D. 1775 avoid any further litigation over the interplay of tribal sustenance fishing, the Settlement Acts, and the CWA. EPA proposes to issue a new decision that would "reverse" the substance of the 2015 decision prior to December 3, 2019, *Albright Decl.* at 100, rather than to simply dissolve the disputed decision after it has been superseded by the new framework. The

Tribes were shocked by this development and explained to EPA:

> [T]he appropriate "follow-up" to the productive settlement negotiations you facilitated between the parties to <u>Maine v. Wheeler, et al.</u>, the passage of L.D. 1775, and Maine's forthcoming water quality standards . . . is to replace the prior water quality standards spurring the litigation with the new agreed-upon standards, and to further the amicable resolution of the case . . . . The suggestion that EPA might now propose to "reverse" the substance of the disputed decisions presently before United States District Judge Levy, notwithstanding that those decisions will soon be moot, would threaten the essence of the parties' negotiations and intent: that, as Commissioner Reid states, the parties not be forced to "give up their positions on the legal and jurisdictional positions that had formed the basis of the dispute."

*Id.* at 104. The Tribes participated in a telephonic consultation with EPA on August 29, 2019, ECF 180 at 2, and again urged EPA not to proceed. They explained that any EPA proposal to reverse the 2015 decision was premature given Maine's pending rulemaking and would rekindle the very dispute resolved by L.D. 1775. EPA's October 7, 2019 status report, however, confirms that these requests fell on deaf ears and that EPA intends "to issue in the near future proposed decisions which would revise the set of 2015 decisions challenged in this litigation." ECF 180.

## ARGUMENT

The Court should stay its order of remand because circumstances have fundamentally changed. In only a few months, there will be no live controversy regarding EPA's 2015 decision because the alternative framework and revised WQS negotiated by the State and Tribes will replace it, and the remand will be moot. EPA's proposal to reverse that decision in the interim, rather than simply waiting and vacating it, threatens further litigation over the 2015 decision, Penobscot counterclaim, and EPA's new decision – the exact result the parties sought to avoid through L.D. 1775. The Tribes have tried to steer EPA clear of this ill-advised path, but EPA appears determined to proceed for reasons unrelated to any bona fide controversy. The Tribes therefore request that the Court exercise its continuing jurisdiction and stay its order of remand.

I.    <u>The Court Has Discretion to Stay Its Order of Remand</u>

This Court has the power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants," including discretion to stay proceedings through "the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936). Federal courts regularly exercise this discretion to stay their own orders remanding agency decisions, including when the pending resolution of relevant issues may obviate the need for the remand, *see Cook Inlet Tribal Council v. Mandregan*, No. 14-cv-1835 (EGS), 2019 U.S. Dist. LEXIS 137140, at *8 (D.D.C. Aug. 14, 2019); when parties themselves can potentially resolve outstanding issues, *see Allsbrook v. United States*, 1 Ct. Cl. 194, 199 (Cl. Ct. 1982); and when concerns of fairness to the parties support a stay of the remand, *see Hoffman v. Massanari*, No. C 00-4052-MWB, 2001 U.S. Dist. LEXIS 10599, at *2-3 (N.D. Iowa July 18, 2001). "Generally, in evaluating whether to issue a stay, a court will consider three factors: (1) potential prejudice to the non-moving party; (2) hardship and inequity to the moving party without a stay; and, (3) judicial economy." *Good v. Altria Group, Inc.*, 624 F. Supp. 2d 132, 134 (D. Me. 2009). A stay is particularly appropriate where it is "likely to conserve judicial and party time, resources, and energy." *Bank of Am., N.A. v. WRT Realty, L.P.*, 769 F. Supp. 2d 36, 39 (D. Mass. 2011) (citation omitted).

II.     Circumstances Surrounding the Remand Have Fundamentally Changed

Maine challenged EPA's 2015 decision and framework to protect tribal sustenance fishing under the CWA by reference to the Settlement Acts. The Court remanded the decision so that EPA could reconsider it in light of the State's merits arguments. ECF 162 at 5. Prior to EPA taking any action on remand, however, the Tribes, the State, and EPA reached agreement on an alternative state-law framework to protect sustenance fishing. Once DEP promulgates HHC to protect the new designated use, and if EPA approves Maine's revised WQS, they will replace the

disputed 2015 decision and framework, which may be dissolved, vacated, or otherwise rendered inoperative. The State's claims and Penobscot's counterclaim may then be dismissed. While the Court stayed this case until December 3, 2019, in light of the significant developments since that time, EPA should not feel obligated to act prior to that date, when pending administrative proceedings should obviate the need for EPA to reconsider the substance of the 2015 decision.

III.     A Stay Will Not Prejudice EPA

A stay of the Court's order of remand will not prejudice EPA. First, the history of proceedings makes plain EPA's lack of urgency to revisit the 2015 decision. After Maine petitioned for reconsideration in February 2017, EPA received an eight-month stay in this case to consider the petition. *See supra* at 7.  When EPA finally acted in December 2017, it denied the petition in its entirety. Then in 2018, after Maine filed its merits brief, EPA twice moved for a stay of the briefing schedule, before eventually requesting a voluntary remand. ECF 130, 132.

Second, any action by EPA would be premature. Until DEP completes its rulemaking and submits the revised WQS, and until EPA reviews that submission, EPA cannot determine what analysis, if any, may be necessary with respect to the 2015 decision.[1] The State and Tribes are working together to ensure that DEP's submission enables EPA to dissolve the disputed 2015 framework so that no dispute remains. After advocating for L.D. 1775, EPA will not be prejudiced by deferring any action on remand pending the completion of these highly relevant administrative proceedings. There is simply no reason for EPA to revisit the substance of the 2015 decision when the dispute that is the source of the remand is on the cusp of resolution.

Finally, the Court's order of remand provides that EPA may not take "any action that

---

[1] Maine has not yet submitted revised WQS. The CWA provides that "revised or new water quality standard[s] shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U.S.C. § 1313(c)(2)(A); *see also* 40 C.F.R. § 131.6 ("minimum requirements" for state WQS). DEP began the rulemaking process to promulgate these water quality criteria on October 2, 2019.

would terminate or undermine the effectiveness of the Maine Rule without prior Court approval." ECF 162 at 5. As EPA acknowledged, "the Maine Rule provides protective HHC for Indian waters in Maine" pending resolution of disputes in this case. ECF 157 at 4. While the State and Tribes have now agreed on what standards should apply, the Maine Rule will provide WQS until the new framework is approved and EPA withdraws the rule. A stay pending completion of this process will ensure that there is no regulatory disruption in the interim.[2]

### IV.  The Tribes Will Suffer Substantial Hardship and Inequity Absent a Stay

A stay is necessary to accomplish the purpose of L.D. 1775 and to avoid imposing substantial hardship and inequity on the Tribes. The State and Tribes negotiated the sustenance fishing designated use, the tribal waters subject to the use, and the FCR to protect that use so as to sidestep the disputed issues in this case and to avoid litigating the State's claims and Penobscot's counterclaim. They are working together to ensure that the record developed through the DEP rulemaking process advances that goal. EPA's proposal to proceed on remand would disrupt this process, would divert the Tribes' limited resources to an unnecessary EPA process, and would introduce regulatory uncertainty by destabilizing the foundation for the Maine Rule. And it threatens to keep the core controversy – how EPA considers tribal sustenance fishing in Maine under the CWA – very much alive. Simply put, EPA's proposed action threatens to steal away the benefit of the bargain negotiated by the State and Tribes.

### V.  A Stay Will Promote Judicial Economy

A stay also promotes judicial economy. As discussed above, pending DEP's rulemaking and submission of revised WQS, it is premature for EPA to act. In the interim, judicial economy

---

[2] As EPA explained to the Court, "the challenged decisions constitute the fundamental underpinnings of the Maine Rule," ECF 157 at 5-6, and vacatur or reversal of the 2015 decision, prior to approval of the State's WQS and withdrawal of the Maine Rule, would make the rule vulnerable to attack by industry dischargers.

and the parties' resources are best served by working toward settling this litigation, consistent with the intent of the Maine Legislature, Commissioner Reid, the Attorney General, and the Tribes. There have never been settlement talks between all parties in this case. While a brief stay was entered for talks between EPA and the State, ECF 132, those talks would not have resolved the dispute between the State and Tribes. But now, for the first time, the Tribes and State have reached agreement on a framework to protect sustenance fishing in Maine. *See Albright Decl.* at 32 (Commissioner Reid testifying that L.D. 1775 "is a way to begin rebuilding trust and goodwill following years of disagreements and litigation"). A stay would thus enable the parties to collaborate on how to accomplish the replacement of the 2015 framework and the dismissal of all claims without prejudicing any party's legal position. EPA's proposal to reverse the 2015 decision would have the opposite effect, likely igniting a new, unnecessary round of litigation. The parties have a good faith obligation to avoid that result. When EPA moved for a stay in 2017, it noted the potential to "moot this case entirely." ECF 103 at 3. The same is true now – even more so, because the State-Tribal negotiations have borne fruit.

## CONCLUSION AND REQUEST FOR RELIEF

The Court should stay its order of remand pending DEP's rulemaking, the State's submission of revised WQS, and EPA's action on those WQS. If such action and the withdrawal of the Maine Rule does not resolve this dispute and obviate any need for remand of EPA's 2015 decision, then the Court may approve a remand of appropriate timing and scope. The Tribes also respectfully request that the Court refer this matter for a judicial settlement conference. This case should otherwise remain stayed until further order of the Court. The Tribes propose that the parties file status reports regarding the progress of the administrative proceedings canvassed in this motion on the same 90-day schedule previously ordered by the Court. ECF 172.

Respectfully submitted this 16th day of October, 2019.

/s/ Cory J. Albright
Cory J. Albright
Jane G. Steadman
KANJI & KATZEN, PLLC
401 Second Ave. S., Suite 700
Seattle, WA 98104
Telephone: (206) 344-8100
Email: calbright@kanjikatzen.com
Email: jsteadman@kanjikatzen.com
*Pro hac vice*

/s/ Riyaz A. Kanji
Riyaz A. Kanji
KANJI & KATZEN, PLLC
303 Detroit Street, Suite 400
Ann Arbor, MI 48104
Telephone: (734) 769-5400
Email: rkanji@kanjikatzen.com
*Pro hac vice*

/s/ Tim Norton
Tim Norton
KELLY, REMMEL & ZIMMERMAN
53 Exchange Street
P.O. Box 597
Portland, ME 04112-0597
Telephone: (207) 775-1020
Email: tnorton@krz.com

ATTORNEYS FOR THE HOULTON BAND
OF MALISEET INDIANS


/s/ David M. Kallin
Kaighn Smith, Jr.
David M. Kallin
DRUMMOND WOODSUM
84 Marginal Way, Suite 600
Portland, ME 04101
Telephone: (207) 772-1941
E-mail: dkallin@dwmlaw.com

COUNSEL FOR PENOBSCOT NATION

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2019, I electronically filed (1) Defendant-Intervenors Houlton Band of Maliseet Indians' and Penobscot Nation's Motion to Stay Order of Remand and Incorporated Memorandum of Law, and (2) Declaration of Cory J. Albright in Support of Defendant-Intervenors Houlton Band of Maliseet Indians' and Penobscot Nation's Motion to Stay Order of Remand and Incorporated Memorandum of Law, with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties listed on the electronic service list within the CM/ECF system.

Dated at Seattle, Washington this 16th day of October, 2019.

*/s/ Cory J. Albright*
Cory J. Albright
KANJI & KATZEN, PLLC
401 Second Ave. S., Suite 700
Seattle, WA  98104
Telephone: (206) 344-8100
*Pro hac vice*