UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| STATE OF MAINE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW WHEELER, in his | ) | |
| capacity as Administrator, | ) | |
| U.S. Environmental Protection | ) | |
| Agency, et al., | ) | 1:14-cv-00264-JDL |
| | ) | |
| Defendants, and | ) | |
| | ) | |
| HOULTON BAND OF MALISEET | ) | |
| INDIANS and PENOBSCOT | ) | |
| NATION, | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

**ORDER DENYING MOTION TO STAY REMAND ORDER**

On December 3, 2018, the Court granted the U.S. Environmental Protection Agency's ("EPA") motion for voluntary remand (ECF No. 162). EPA had sought a remand so that it could reconsider its February 2015 disapproval of several of Maine's Water Quality Standards for being insufficiently protective of tribal sustenance fishing rights in tribal waters. In the year since the remand order was issued, the Maine Legislature and EPA have taken actions affecting the interests of the parties to this case. The Intervenor-Defendants Houlton Band of Maliseet Indians and Penobscot Nation (collectively, "the Tribes") now move for a stay of the Court's order

of remand, arguing that a stay will enable the parties to carefully sequence each of their actions so as to avoid creating unnecessary legal and/or administrative disputes. Gerald D. Reid, in his capacity as Commissioner of the Maine Department of Environmental Protection ("DEP"), the State of Maine (collectively with DEP, "Maine"), and EPA oppose the Tribes' motion, maintaining that a stay will only temporarily forestall—not avoid—the legal disputes that the Tribes refer to. For the reasons discussed below, I deny the Tribe's motion to stay the remand order (ECF No. 182).

## I. BACKGROUND

The remand order in this case sets forth the history of the parties' dispute, and I repeat relevant portions of it before discussing more recent developments. *See Maine v. Wheeler*, No. 1:14-CV-00264-JDL, 2018 WL 6304402, at *1–2 (D. Me. Dec. 3, 2018).

### A. Relevant History Prior to the December 3, 2018 Remand Order

The Clean Water Act requires states to review their water quality standards at least once every three years and to submit the results of their reviews to EPA. *See* 33 U.S.C.A. § 1313(c)(1) (West 2018). In July 2014, Maine brought this action against EPA, claiming that EPA had failed to timely approve or disapprove Maine's revised surface water quality standards. In February 2015, EPA issued a formal decision in which it approved some of Maine's water quality standards and disapproved others. Relevant to this litigation, EPA disapproved several of Maine's standards affecting tribal lands because EPA concluded that the standards did not ensure water quality

2

sufficient for the tribes to take fish from tribal waters for sustenance and therefore did not adequately protect tribal sustenance fishing rights.

Maine sought judicial review of EPA's decision under the Administrative Procedure Act, 5 U.S.C.A. §§ 701-706 (West 2018), and a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C.A. §§ 2201-02 (West 2018). Maine disputed EPA's interpretation of the Clean Water Act, the Maine Act to Implement the Indian Land Claims Settlement, 30 M.R.S.A. §§ 6201, *et. seq.* (West 2018) (the "Maine Implementing Act"), and the Maine Indian Claims Settlement Act of 1980, 25 U.S.C.A. §§ 1721, *et. seq.* (West 2018) (together with the Maine Implementing Act, the "Settlement Acts"). Thereafter, EPA promulgated replacement water quality standards (the "Maine Rule") for the purpose of protecting tribal sustenance fishing rights in Maine. EPA's Maine Rule filled the regulatory gap created when EPA disapproved some of Maine's proposed water quality standards in February 2015 and Maine did not propose any replacements. The Maine Rule became effective on January 18, 2017, and remains in effect today. 40 C.F.R. § 131.43 (2018).

In February 2017, in the wake of the 2016 presidential election and the change of administrations, Maine petitioned EPA to reconsider its 2015 decision. This led to the Court ordering this case stayed from May to December 2017. In December 2017, EPA informed the Court that it had "determined not to withdraw or otherwise change any of the decisions that are challenged in this case." ECF No. 109 at 2. With the stay terminated, Maine filed its Motion for Judgment on the Administrative Record and its opening brief on the merits of its Second Amended Complaint on February 16,

3

2018. In June 2018, and before EPA responded to Maine's opening brief, Maine and EPA filed a joint motion for a 30-day stay to engage in settlement talks, which was granted. The parties did not reach a settlement, and on July 27, 2018, EPA filed its motion for voluntary remand. In its motion, EPA represented that it intended to make substantive changes to the original agency decision at the heart of this case, and it identified several intervening events, including the replacement of three key EPA officials; a letter from the Department of the Interior revising its earlier letter upon which EPA's February 2015 decision was partially based; and the substance of Maine's opening brief for judgment on the administrative record, which EPA claimed helped "crystalize[] the issues." *See* ECF 162 at 4–5 (citing ECF Nos. 139 at 2–3; 157 at 13).

**B.     The Remand Order and Subsequent Relevant History**

On December 3, 2018, I issued an order granting EPA's motion for remand which is the subject of the Tribes' current motion seeking a stay. The order noted that courts generally grant motions for remand where an agency makes clear that it intends to substantively reevaluate its original decision. Thereafter, the Maine Legislature passed L.D. 1775, "An Act to Protect Sustenance Fishing," which was developed by DEP in consultation with EPA and the Tribes. Governor Janet Mills signed the bill into law on June 21, 2019. P.L. 2019, ch. 463 (effective Sept. 19, 2019). The Act creates a new, expressly defined "sustenance fishing designated use" within Maine's water classification program. *See id.* at §§ 4–5. It requires DEP to adopt rules no later than March 1, 2020, that calculate and establish water quality criteria

4

protective of human health for toxic pollutants and the sustenance fishing designated use. *Id.* at § 16.

In response to Maine's adoption of the Act, on November 6, 2019, EPA approved Maine's sustenance fishing designated use subcategory and the waters to which it applies. Simultaneously, EPA issued a notice announcing its intention to withdraw its 2015 decisions under the Clean Water Act. The notice explained:

> EPA has now determined that it lacked statutory authority to recharacterize the State's general fishing designated use to mean sustenance fishing. Even if EPA had this authority—which EPA now concludes that it did not—the Agency now believes that it was inappropriate and unnecessary to reinterpret the State's fishing use to mean sustenance fishing in an attempt to "harmonize" the Settlement Acts and the [Clean Water Act]. Contrary to [] EPA's 2015 statement that it "must interpret the fishing use to include sustenance fishing," the Settlement Acts do not expand EPA's [Clean Water Act] authority, nor do they require Maine to designate a general fishing use with a sustenance component or EPA to recharacterize a designated use to mean sustenance fishing.

ECF No. 184-2 at 10. EPA's notice also indicated, moving forward, that EPA would not treat the Maine Implementing Act's provision of certain sustenance fishing rights as a "water quality goal use" which EPA must review under the Clean Water Act, and that it had previously erred by interpreting the Maine Implementing Act to represent a sustenance fishing designated use for reservation waters. *Id.* at 10–11. The notice also indicated that EPA would approve Maine's "fishing" designated use without interpreting it to mean "sustenance fishing," and that it would withdraw its 2015 disapprovals of human health criteria for waters in Indian lands because the disapprovals were based on the sustenance fishing designated use decisions which EPA now seeks to withdraw. *Id.* at 11. The parties agree that EPA's withdrawal of

5

its 2015 disapprovals will not, standing alone, put Maine's previously disapproved human health criteria into effect.

## II. ANALYSIS

Federal courts "possess the inherent power to stay proceedings for prudential reasons." *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004) (citing *Landis v. N. Am. Co.,* 299 U.S. 248, 254–55 (1936) and *Marquis v. F.D.I.C.*, 965 F.2d 1148, 1154–55 (1st Cir. 1992)).[1] "Generally, in evaluating whether to issue a stay, a court will consider three factors: (1) potential prejudice to the non-moving party; (2) hardship and inequity to the moving party without a stay; and, (3) judicial economy." *Good v. Altria Grp., Inc.*, 624 F. Supp. 2d 132, 134 (D. Me. 2009). The party seeking the stay bears the burden of demonstrating that a stay is appropriate. *See Kourembanas v. InterCoast Colls.*, No. 2:17-cv-00331-JAW, 2018 WL 4087999, at *2 (D. Me. Aug. 27, 2018). I evaluate the Tribes' request for a stay in relation to the three factors, turning first to the question of judicial economy, which is the primary basis asserted by the Tribes for a stay.

### A.  Judicial Economy

The Tribes' motion asserts that the Tribes and Maine negotiated provisions of L.D. 1775 to make it unnecessary to resolve several of their disputes presented in this

---

[1] EPA and Maine frame the Tribes' motion as one seeking reconsideration of the Court's December 3, 2018 order rather than as one seeking a stay. *See, e.g.*, *XP Vehicles, Inc. v. U.S. Dep't of Energy*, No. 13-cv-0037 (KBJ), 2016 WL 11066678, at *1 (D.D.C. July 21, 2016). There is some dispute as to what rule and standard should apply on a motion for reconsideration of an order granting remand to an agency, which could make it harder for the Tribes to obtain the relief they seek. *See AARP v. U.S. Equal Emp't Opportunity Comm'n*, 292 F. Supp. 3d 238, 241 n.1 (D.D.C. 2017). Nevertheless, because I deny the Tribes' motion even under the more lenient standard that governs a request for a stay, I do not resolve this dispute.

6

case, and that EPA's current proposal unnecessarily threatens to reanimate the "core controversy" of the case, namely, how EPA treats tribal sustenance fishing in Maine under the Clean Water Act. The Tribes assert that a stay would permit the parties to achieve the same outcome achieved by the decisions proposed by EPA in its November 2019 notice, but without requiring EPA to opine on the sensitive issue of whether it may and should regulate tribal sustenance fishing in Maine under the Clean Water Act. In particular, the Tribes contend that a stay pending DEP's rulemaking and EPA's review and approval of Maine's water quality standards would effectively "moot" the disputed 2015 EPA decision and framework. The Tribes maintain that with a stay in effect, EPA could withdraw the 2015 framework without formally repudiating it, which is an approach EPA has adopted in other states. The net effect of these actions, the Tribes argue, is that EPA would not need to comment on its view of tribal sustenance fishing in Maine under the Clean Water Act and, therefore, the Tribes would not need to challenge EPA's position before EPA's ongoing administrative process or before this Court.

There is a flaw, however, with the Tribe's argument. The enactment of L.D. 1775 was the product, at least in part, of the parties' joint effort to achieve an agreed-to resolution of the water quality standards that should apply to tribal waters, but L.D. 1775 does not resolve the parties' underlying dispute as to EPA's authority under the Clean Water Act to regulate tribal waters. Thus, although L.D. 1775 was the product of a cooperative process by the parties, and although it places them on the precipice of realizing EPA-approved state standards endorsed by the Tribes, L.D.

1775 did not result in a global settlement of all of the issues in this case. In addition, L.D. 1775 does not restrain EPA's administrative authority, including its authority to review and reconsider its 2015 decisions.

The enactment of L.D. 1775 and Maine's adoption of water quality standards implementing it will not moot the central dispute between Maine and EPA about EPA's 2015 interpretation of the Clean Water Act and the Settlement Acts, because L.D. 1775 applies to waters that are not coextensive with those governed by EPA's 2015 decisions. Those decisions apply to all waters in Indian lands, while L.D. 1775 applies to several waters outside of Indian lands and not all waters within them. *Compare* ECF No. 30-1 at 2, 4–5 ("all waters in Indian lands"), *and* ECF No. 38 at 5308–09, *with* P.L. 2019, ch. 463, §§ 3, 6–15 (identifying specific water segments as subject to Maine's new sustenance fishing designated use). The result is that "gap waters"—waters covered by one but not both frameworks—will exist if EPA does not withdraw the framework established by its 2015 decisions. Thus, even if a stay is granted, as the Tribes request, and the parties were to sequence the various legislative and administrative processes as the Tribes envision, the "gap waters" will perpetuate Maine and EPA's dispute about EPA's interpretation of the Clean Water Act and Settlement Acts, unless EPA also withdraws its 2015 decisions. The circumstances here are thus unlike those in other states that the Tribes point to, where EPA approved state-proposed water quality standards and withdrew its own standards without also repudiating the reasons for its adoption of its own standards. *See* 79 Fed. Reg. 57,447 (Sept. 25, 2014) (withdrawal of federal water quality

8

standards in Florida); 78 Fed. Reg. 20,252 (Apr. 4, 2013) (same in New Jersey, Puerto Rico, and California's San Francisco Bay). In those instances, the waters regulated first by EPA's standards, and subsequently by the states' standards, were coextensive.

Nor can EPA merely withdraw its 2015 decisions without any explanation. "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). The Tribes' disagreement with the reasons EPA has proposed for its withdrawal of the 2015 decisions does not relieve EPA of its obligation to articulate its reasons.

Accordingly, I conclude that judicial economy does not favor a stay.

**B.     Hardship and Inequity to the Moving Party Absent a Stay**

The Tribes contend that the notice-and-comment process EPA has established will impose an undue hardship on them. The decisions proposed in EPA's November 2019 notice are not final and EPA has indicated its intent not to take final action on them until after the public, including the Tribes, has the opportunity for notice and comment. The Tribes contend, first, that the comment window is not a substitute for a stay and, second, that engaging in the comment process will impose "significant burdens on the Tribes' limited resources." ECF No. 186 at 4.

As to the Tribes' first point regarding the need for a stay, I have already determined that, absent the parties reaching a global settlement in this case, a stay is unlikely to avoid the need for a judicial decision regarding EPA's regulatory

9

authority under the Clean Water Act. As to the burden that the notice-and-comment process will place on the Tribes, while there are undoubtedly substantial costs involved in commenting on an agency proposal and then challenging an adverse agency decision, that alone does not provide a footing on which to stay a case. "[C]ourts have never reviewed *proposed* rules, notwithstanding the costs that parties may routinely incur in preparing for anticipated final rules." *In re Murray Energy Corp.*, 788 F.3d 330, 335 (D.C. Cir. 2015) (Kavanaugh, J.).

Lastly, the water quality standards promulgated by EPA in 2017—which implemented the protection of sustenance fishing rights the Tribes then sought—will remain in effect at least until EPA has completed its notice-and-comment process. In the December 3, 2018 remand order, I required EPA to seek Court approval should it desire to take any action that would terminate or undermine the effectiveness of those standards. That injunction remains in effect and, at the hearing on the Tribes' motion for a stay, all of the parties affirmed their understanding that the 2017 water quality standards remain in effect during the pendency of EPA's effort to withdraw its 2015 decisions and, most importantly, until further order of the Court. Thus, the Tribes will receive the protections afforded by those standards, regardless of whether a stay is put in place.

Because any prejudice to the Tribes absent a stay will be minimal, this factor weighs against granting a stay.

C. **Potential Prejudice to the Non-Moving Parties**

Both Maine and EPA argue that, because L.D. 1775 is not coextensive with EPA's 2015 decisions, a stay will force EPA to uphold its standards at least as to the

10

"gap waters," and a stay would simply postpone, but not resolve, the legal dispute which was the genesis of Maine's complaint. Thus, Maine argues that it will have to litigate with EPA over the "gap waters," and will be prejudiced if a stay is granted. EPA argues that it too will be prejudiced if a stay is granted because the 2015 decisions will remain in effect as to the "gap waters" "even though EPA no longer believes they are appropriate." ECF No. 184 at 8. EPA also notes that it has already allocated resources to finalizing its proposal to withdraw the 2015 decisions.

The very purpose of the December 3, 2018 Remand Order was to permit EPA to reconsider its 2015 decisions. I noted then that agencies may seek remand to reconsider their previous positions even in the absence of intervening events, that EPA had nevertheless identified several intervening events, and that the law favors remand where an agency intends to make substantive changes to an earlier decision. ECF No. 162 at 4–5 (citing *SKF USA Inc. v. United States*, 254 F.3d 1022, 1028–29 (Fed. Cir. 2001) and *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018)). Thus, a stay of the remand order would prejudice both Maine and EPA by interrupting the completion of the administrative process required for EPA to formally adopt its revised interpretation of the limits of its authority under the Clean Water Act. The potential prejudice to Maine and EPA, as the non-moving parties, weighs against granting the stay sought by the Tribes.

### III. CONCLUSION

For the foregoing reasons, the Tribes' Motion to Stay Remand Order (ECF No. 182) is **DENIED**. It is further **ORDERED** that the December 3, 2018 Remand Order shall remain in effect. The Clerk is directed to schedule a case management

conference.  EPA shall file its motion to further extend the stay of litigation beyond the time announced in the December 3, 2018 Order.[2]

**SO ORDERED.**

**Dated this 16th day of January, 2020.**

                                                       **/s/ JON D. LEVY**
                                         **CHIEF U.S. DISTRICT JUDGE**

---

[2] EPA noted on November 14, 2019, in its court-mandated report that it was going to file for an extension of the stay of litigation (not to be confused with the Tribe's motion to stay the remand order).  EPA did not make such a filing.  At the December 2, 2019 hearing, EPA orally requested an extension, but without full development of the relief sought and the reporting required.